Gene Reese, USC Immigration Clinic, pro bono counsel for Petitioner Jose Galan-Najarro. Mr. Galan-Najarro is a 35-year-old man who suffers from schizoaffective bipolar disorder with seizures. Mr. Galan-Najarro's schizoaffective disorder and seizures are an ongoing lifelong illness, and he must take multiple anti-psychotic and anti-seizure medications in order to manage his symptoms. And those symptoms include, in addition to frequent seizures, auditory hallucinations, hearing commanding voices, voices that he describes as fighting with him, a lack of impulse control, believing people can hear his thoughts, paranoia, medical records show there's some lack of control over body movements. The agency finds that Mr. Galan-Najarro will not have regular access to this medication to manage the symptoms of his psychoaffective bipolar disorder with the seizures in El Salvador. Without Dr. Nelson, a medical doctor who evaluated Mr. Galan-Najarro in immigration detention, presents the best case scenario for Mr. Galan-Najarro here in the US without medication, which would be homelessness, inability to feed himself, and frequent seizures, and not being able to control those symptoms that include voices. So without these medications, the visible symptoms of talking and fighting with voices, not being able to feed oneself, being homeless on the streets, and having these seizures in public will bring Mr. Galan-Najarro to the attention of many people, including the police, gang members in El Salvador, and will result in him likely finding himself on the steps of the National Psychiatric Hospital. And under all three of these scenarios, he's likely to experience torture. Let me ask you if, you've probably heard of the concept of a decision tree, and we're looking here at what's the prospect of more likely than not in the end of experiencing or having the infliction of torture. So each of those scenarios, what's the percentage prospect you think the evidence supports of the terrible things happening? I mean, it's not 100%. How much less than 100% is it? Well, Dr. Nichols testified that it's very highly likely that he'll be tortured in El Salvador. And I think this crucial first step that he's going to have these symptoms without medication, he is going to come to the attention of the police. So I think it is almost, you know, I know certain, Your Honor, that he is going to be in the streets with these symptoms. And at some point in his lifetime in El Salvador, we'll come into contact with the police or we'll be taken to the psychiatric hospital. And of course, the regular- Each of those steps, there is an if attached. I mean, the first step you cited is if he doesn't have his medication. So what's the likelihood of that? The agency finds that he will not have regular access to medication. So I think that fact has been established, that he will not have regular access to medication. And Dr. Nichols goes on to explain that. He has self-conducted studies. There's limited availability of psychotropic medication. It's not available all months of the year. It's costly. And so I think that that fact has been established and has been found by the agency that he won't have regular access. And there is no evidence in the record to suggest that without medication, Mr. Galan-Najado will be able to quietly live his life in El Salvador and not bother anyone. And the agency erroneously finds that Mr. Galan-Najado, despite his mental disorders prior to his diagnosis and treatment, was able to keep employment and have housing. And the record compels a contrary conclusion. Mr. Galan-Najado has spent 14 years incarcerated in the United States. And prior to his incarceration in 2008, he was only able to keep a job for a year and approximately a year and six months as a mover and then as a janitor. And he testified that he lost his job as a janitor because of his getting into trouble with addiction, which he used to self-medicate to be able to manage the symptoms of his illness before he was able to be treated with medication. So the record compels the conclusion that he will come to the attention of authorities as he has here. And in El Salvador, in a country where it's smaller than the size of Massachusetts, there's country conditions evidence that gangs control large territories, that the state has actually lost these territories to the gangs. Gangs detain people in their territories and look at their IDs. It's highly likely and more probable than not that he will come across these gang members. Just a minute, in his background, his own background, he had one incident with a gang violence as a child, and I'm not even sure that that has anything to do with his condition. Might've been as to generalized violence. That was more than 10 years ago and otherwise nothing, right, in his history? Well, he left El Salvador when he was 14 years old. I think he returned for about a year when he was 15. And the rest of the time he's been in the US and he did get into trouble with gang members in the US and was shot, but he testified- And so what happened in the US is evidence about what's gonna happen in El Salvador? No, but I think it goes to the likelihood of coming into, goes to the likelihood of coming in contact with gangs. The problem that I have with your argument, and that's all I'm trying to put together, is it's a substantial evidence review here. So I look at the gangs, I look at what's been said, and I look at the history. I look at the police. The IJ recognized there were incidents of inhumane treatment by the police. However, Dr. Nichols said there's no data available regarding the harm by police to mentally disabled people. And at best, there's only 18 cases of cruel inhumane treatment by the police. So how can I say on a substantial evidence review that the police are gonna be the problem? It seems to me there's a lack of evidence. Well, to respond to your point about the gangs when he was in El Salvador, he was only 15 and he testified. We've already gone through that, deal with the police. So Dr. Nichols provides testimony regarding, in the form of testimony declaration regarding the likelihood of him coming into contact with the police and there's evidence of extrajudicial killings, beatings. This evidence is credible. He is- Dr. Nichols himself says there's no data available regarding harm by police to mentally disabled people. And the regulations do not require data regarding the likelihood- Well, I understand it doesn't have to do with data, but if I'm on a substantial evidence review, it seems to me that I've got no history necessarily. And now I'm looking at what your expert says the data would suggest. I've got only 18 cases of cruel inhumane treatment by police in all of what I've got. And I'm supposed to say there's not any substantial evidence to sustain what they found?  in the form of Dr. Nichols' testimony that's based over 20 years of his experience, his research, his studies, his interviewing, including visiting the National Psychiatric Institute, talking to people who have been abused by the police. That is evidence. And this court and Colby Holder recognized that an expert who's talking about research studies, personal observations and experiences can meet that burden of substantial evidence. And this is why, and Dr. Nichols provides that evidence. So the 18 cases of police torture that is referred to in the country conditions report is only those cases that are reported. And that is one piece of the entire record in its totality that includes this likely evidence of him coming into contact. I would note too, your honor, the police, the gang and the National Psychiatric Hospital are not individual to be looked at individually, but in the aggregate that the totality of these potential sources of torture are to be assessed in the aggregate. And the agency did not do that here. The agency talks about some evidence of police abuse, some evidence of torture at the National Psychiatric Hospital, some evidence of problems of torture by the gangs, but doesn't assess it in the aggregate. And in this court and Colby Holder remanded the case because the agency- Well, you don't have to assess it in the aggregate. You can, or you can't given our case law, right? Well, I think you have to assess all sources of torture. You have to assess all sources, but you don't have to do it in the aggregate. You may, says the statute, or says the case law. Your honor, I believe that the case law remanded in Colby Holder because the board failed to do that. The board in this case appears to have done exactly that. I mean, I'm reading from page four of the record. The respondent has not shown a likelihood of suffering torture, even when all potential sources of torture are considered in the aggregate. And that statement, your honor, invoking the standard doesn't satisfy the fact that they actually did the standard and this court- Well, wait, wait, wait, stop right there. I mean, they say, they state this as a conclusion. It does, that sentence I just read to you, doesn't say this is the standard and moved on. They stated a conclusion that he hasn't shown a likelihood of suffering torture, even when all potential sources of torture are considered in the aggregate. Now you may dispute what they've done, but to say to us, they didn't mean what they said. And so they never considered what they just said they considered. That's not a persuasive argument. I guess what I'm saying is that's a catch-all phrase. And there's evidence here that they didn't consider the totality of the record because- What is that evidence? The record- What is the evidence that they did not consider? Not that they considered it and got it wrong. What evidence is there they did not consider? They denied the cat regarding the National Psychiatric Hospital based on the lack of data. And that, the regulations don't require data regulations- Stop right there, because you're telling me why you think what their result was was wrong. What you argued and what I asked you about is evidence that they did not consider. I don't hear any of it. And I don't see anything that contradicts what they say. So you can argue that substantial evidence may not support their conclusion, but I haven't heard anything that suggests they did not consider, which is the argument I heard you to make. Well, then, Your Honor, I guess I'm saying they didn't consider because the substantial evidence compels a contrary conclusion, so I'm making that inference. But what I mean to say then is that there is all this evidence provided by Dr. Nichols that compels the conclusion that it's more likely than not that he would be tortured in El Salvador by the police or the gangs or the public officials at the National Psychiatric Hospital. There's a difference between those two propositions. Our court gets things wrong all the time. I get things wrong all the time, at least according to the Supreme Court. Nobody's saying we're not thinking about it. They think our thinking is wrong. And in this case, I think there's a clear distinction between whether the board considered and whether the board considered but didn't have substantial evidence to support. So that's a distinction I think it's worth preserving. And I don't hear any support for the proposition I heard you to argue, so go ahead and speak to why you don't think substantial evidence supports. Because the regulations allow this court and require, not this court, excuse me, the agency to consider human rights violations, country conditions evidence. Dr. Nichols provides uncontested testimony to country conditions. He's qualified as an expert on country conditions as they pertain to someone with schizoaffective bipolar disorder. And he testifies based on his studies and his research about the likelihood of torture. And so in the totality of the evidence, requiring data, which doesn't exist. And the reason that data doesn't exist is because El Salvador does not have a mechanism to keep track of the treatment of people in these psychiatric institutions. It has been criticized by the United Nations for that failure. That requiring Mr. Galangaro to provide evidence that is not available and doesn't exist in order to meet his burden, when there is this wealth of country condition evidence provided by Dr. Nichols and other country condition reports to establish his burden. I think that is what compels the conclusion that he is more likely than not to be tortured in El Salvador. And as Judge Smith was talking about, or what is this percentage? Mr. Galangaro is not required to provide to a certainty or beyond a reasonable doubt, or even clear and convincing, just that it's more probable than not. And that based on this record, including the testimony of Dr. Nichols, which is expert testimony, which is credible, which is accepted as true, the record compels the conclusion that because of these symptoms and his psycho-affective bipolar disorder, he is likely to come to the attention and end up at some point in his lifetime in contact with the police, in contact with gang members, or at the steps of the National Psychiatric Hospital, or all three of those sources over the- Doesn't Colby- Doesn't Colby- Oh, go ahead. Sorry. Nope, you had a question, Judge Smith. Doesn't Colby Holder require a greater than 50% chance that he would be tortured? Yes. Okay, so it's not just more likely than not, but he's got to show a greater than 50% chance, right? And I was using those terms interchangeably, but I agree, Your Honor, a greater than 50% chance. All right, because you were saying there is no number we've got to reach. It's just more likely than not. So I was just trying to make sure I understood what your argument. So thank you. Thank you. All right, thank you, counsel. We'll hear from the government. May it please the court, Chris Buchanan, for the respondent, United States Attorney General William P. Barr. The court is correct to inquire into the percentage prospect, to borrow a phrase, the likelihood of torture in this case, because there is a distinction between petitioner making out his claim before the agency, where he's only required to establish eligibility or the likelihood of torture as a more likely than not. And compared to standing before this court today, where the burden is on the petitioner to identify record evidence that compels the conclusion that more likely than not, he will be tortured by any of the various actors identified below. And it is the conflict in evidence as to each of those actors that controls this case and places this case in the category of a straightforward application of the governing burden of proof. There must be record evidence that shows that no reasonable fact finder could fail to agree that he will, more likely than not, be tortured by the Salvadoran police  And as we demonstrated in our brief, the record evidence about the likelihood of torture as to each of those actors is in conflict. There is evidence for his claim, but there's also evidence against his claim. And under Pedro Mateo, well-established precedent in this circuit, where the record admits competing inferences, the agency's choice between the two cannot be error. And that's what we have here. The petitioner spoke at length about Dr. Nichols and that's certainly consistent with her brief, but it doesn't account for evidence in the record that's outside of Dr. Nichols' testimony or his affidavit. There is, in fact, as the agency pointed out, evidence that cuts against his opinions about the likelihood of torture. And the fact that he's an expert doesn't somehow displace the fact-finding requirements or responsibility of the immigration judge. I think that this court made that clear in the Chavarin case, the unpublished decision issued in 2017, where there also was an expert introduced who rendered opinions about the likelihood of torture. And the panel, specifically in that case, noted that it was permissible, it was permitted. I think it was their word. It was permitted for the immigration judge to ultimately find against the expert's recommendation based on competing evidence that was also in the record. And that's what we have here. Dr. Nichols has repeatedly rendered an opinion about the likelihood of torture under various scenarios. But as the immigration judge points out, when he goes through the hypothetical steps, whose sequence concludes in an assertion of torture, the evidence is not just what Dr. Nichols thinks. And so, for example, as pointed out previously, the assertion about police, torture by police, the likelihood of torture by police, where on the one hand, Dr. Nichols believes it's more likely than not. On the other hand, the ombudsman who collects and who is the governmental receiver for such complaints reports only 18 of those. And those two portions of evidence are in tension. The agency's choice between those two inferences drawn from that tension cannot be error. And this is the pattern that repeats itself. It repeats itself with respect to the involuntary commitment claim. It repeats itself with respect to the- Let me ask you to focus. I mean, there is evidence cited by the agency with regard to torture by police. Is there anything comparable with regard to what would happen if he's committed to the psychiatric unit? Your Honor, I think the evidence is at best indeterminate or equivocal. There is- I don't- I mean, you cited Dr. Nichols. Let me, and then the agency points to this contrary evidence. And the argument I hear from the petitioner is that there is no counterpoint, that there isn't a response to what Dr. Nichols has to say about the area that probably matches more closely his expertise. What would happen if the petitioner were committed? So what evidence would you cite? Your Honor, I would point- Yes, Your Honor, I would point you to the record at 592. This is a report by the Human Commission, a Human Rights Commission. It's not the UN group, but it's an NGO that is aligned in that mission set. And there, in the course of conducting basically an analysis of mental health, the provision of mental health service in El Salvador, that report notes that there were 16 psychiatric wards that were added to various hospitals throughout the country in an effort to expand psychiatric capacity. And this was an explicit recognition by the Salvadoran authorities that the National Psychiatric Hospital was overpopulated. And so their answer was not to just let it be, but to take some action to address that and to ameliorate that. You know, and also- I didn't understand, I'm sorry to interrupt, but I did not understand their argument to be that the problems were related to overpopulation, but with the therapy that they would receive there. So does that record evidence suggest that they've changed the focus on that or that they've alleviated some of the harms, the potential harms? Well, Your Honor, let me add also to that site. From Dr. Nichols' testimony itself, we learned that there were protocols introduced in 2011 specifically to address the use of ECT in the National Psychiatric Hospital. Now, Dr. Nichols goes on to say that as the efficacy of those protocols, whether they're having a, what sort of effect they're having, he says that his evidence is conflicting on that point. I think we provide all the citations of that in our brief, but that the National Public, or I'm sorry, National Psychiatric Hospital has taken steps specifically to change how ECT is implemented is not in dispute. What could be in dispute is whether those are efficacious, but the agency doesn't proceed in its analysis that far. There's no finding of facts beyond simply noting that the Salvador government has imposed these protocols that in that, and I'm thinking specifically of the agency's acquiescence analysis where they, this was a finding identified as evincing that the Salvador government did not specifically intend to torture mental health patients. They didn't deliberately intend to harm them. And so to go back to the original question. But neither the IJ or the BI made a specific intent finding regarding that, did they? With respectfully honor, I disagree. The immigration judge conducted a separate analysis into the specific intent to torture only as to the involuntary commitment claim. The immigration judge did not assess specific intent with respect to Salvadoran police misconduct or to harm imposed by gang members, but instead just examined specific intent in the context of the National Psychiatric Hospital and specifically ECT there. And that's why the 2011 protocols was irrelevant to his discussion. Now, the board, as you'll see in the record, doesn't in its decisions, and it does not explicitly mention that, but it affirmed the immigration judge's decision under matter of Roboto, which under circuit precedent holds in the entirety of the immigration judge's decision, not just the conclusions, but the reasoning, which in this case would also include this separate standalone specific intent or acquiescence, however you wanna call it, analysis. And in my view, that's critical because regardless of what the course will be. But just a minute, it seems to me, if we read the BIA decision, BIA decision was concluding that the hypothetic chain resulting in abusive, possible abusive treatment did not result in a greater than 50% chance that he would be tortured. That's correct, your honor. That their decision was more on that the chain was not enough rather than the intent. And they did that because the IJ had found there was a lack of evidence on how the treatment would rise to the level of torture because the ETC was implemented only after other treatments were ineffective and Elva Salvador was making efforts to protect patients from ECT. That's what I understood. That's all true, your honor. And I think that substantial evidence supports that determination, but I would point your attention to the record at three in that first sentence of the third paragraph where the board affirms at the outset, affirms the entirety of the immigration judge's decision under matter of Roboto. Yes. In doing so, the board has endorsed and affirmed the immigration judge's analysis as to government acquiescence as the immigration judge titles it. This is in that analysis is in the record at page 74 under paragraph three. And it is in paragraph three that the immigration judge specifically addresses the question of whether conditions in the National Psychiatric Hospital even specific intent to torture or not. And he considers evidence both ways. He discusses that, but he reaches a conclusion that puzzled me. So I'll put it to you. And I think your brief made a similar argument talking about government acquiescence, but the hospital is a government institution and treatment provided there  So I'm kind of puzzled as to how the conclusion could be well, if he's tortured, it's not with the acquiescence of the government because it's the government that's doing it. So I hear what you're saying with regard to the IJ's discussion of intent comes in under the caption government acquiescence, but I can't understand the conclusion that it's acquiescence. If in fact the hospital is a government institution. Your honor, if I could respond just briefly, and I'm looking at the record of page 344, this is Dr. Nichols testimony where he concludes that overall, these are his words, while the hospital is attempting to channel its outpatients to hospitals across the country, reduce the size of its chronic units, improve the quality of its treatment. Dr. Nichols concludes that the progress is slow and hampered by, and these are his, this is his word, financial and political restraints. Now we see that same phrase, hampered by political and financial restraints and the immigration judge's government acquiescence analysis. Now, absolutely correct. Acquiescence usually tied to a third party actor. However, the immigration judge's explicit reliance on Viegas and particularly which really is the seminal case when it comes to evidence that shows or does not show specific intent to torture, because the court there, as you know, well-known, distinguished between general intent and specific intent to torture. But in just as in that case, evidence that the government did not desire to torture because it was taking steps to improve squalor's conditions in Mexican mental health institutions. So to hear the IJ points to efforts by the Salvador government to improve the conditions, which from which the immigration judge finds evidence that the Salvador government does not specifically intend to torture its patients. And so the rationale of the judge lines up cleanly with Viegas. That the immigration judge didn't, you know, palismanically say specific intent in that context, in my mind, goes to do with the artfulness or not of the decision, but the rationale makes plain that the immigration judge is hanging his finding on the Viegas itself, which is relevant here for its specific intent holding. If I've answered your question. Well, I take it, he winds up ultimately expressing his conclusion in terms of government acquiescence. And I hear you urging us to view that, to go back a step and say, it's really talking about intent to inflict torture on the separate issue of acquiescence. I mean, I understand what your brief argues, but is there really a basis to conclude that acquiescence is an issue given that it's a government hospital? The real question is whether the government in running this hospital intends to inflict what we deem to be torture. I agree. I think that is the issue. Is there a specific intent to torture? I also believe that the immigration judge answers that squarely with his reliance and citation to the Viegas. And the fact that the facts found by the immigration judge are precisely the same category of facts that were considered in the Viegas. Whether the Mexican government intended or didn't intend to torture its own mental health patients that turn not just on squalor's conditions, but on external evidence of attempts to improve. And so too, here we have the, it's virtually indistinguishable, except that we're talking about El Salvador instead of Mexico. So, and so yes, specific intent governs. The technical question about acquiescence in terms of whether the mental health staff are third-party contractors as opposed to direct employees in my mind is irrelevant. Because either way, as this court has made clear in cases following Viegas, either way there must be someone in the chain of acting, in the chain of actors that specifically intends to inflict severe harm. Not just intends the act whose consequence is harm, but intends the harm itself. Thank you, counsel. I think you'd use your time, but we'll give a minute for rebuttal from Ms. Rice. Thank you. Thank you, your honor. The agency did not deny Mr. Galandejaro's cat claim for lack of specific intent. So the issue of specific intent is outside the scope of this court's review. The immigration judge made a conclusion regarding government acquiescence, which is wrong because the National Psychiatric Hospital is a government institution. We reject what the government just argued. That is that if you look at the basis for the IJ's conclusion, it's about intent. I disagree. The immigration judge's conclusion is titled government acquiescence. It discussed government acquiescence. It cites to Viegas-Nukesi in a parenthetical. And as your honor pointed out, the court concludes the record does not support a finding Salvadoran government would acquiesce to the respondent's torture. Acquiescence and specific intent are two distinct issues. And I think it would be improper for this court to infer that what the judge really meant when the judge said acquiescence was specific intent. And the board does not, the board adopts the judge's decision, but does not mention specific intent either. So I think quoting Viegas-Nukesi is not a finding of lack of specific intent, especially in light of the actual acquiescence terms that the judge is using here. Finally, I'll say that the government's argument that the agency relied on competing evidence and therefore there's no substantial evidence that compels a conclusion, that's not accurate. Regarding the police torture, the agency cherry-picked this 18 reports of torture by the police. And that doesn't take into account Mr. Galan-Najaro's schizoaffective bipolar disorder and that his personal circumstances that increased the likelihood that he would be tortured by police. Likewise, the reason the agency denies the more likely than not standard for gangs is because of this idea that there's just generalized violence in gangs. This also ignores the evidence of Mr. Galan-Najaro's symptoms and his circumstances. And then lastly, the National Psychiatric Hospital, the evidence of torture there, the agency denies it because of this lack of statistical data, which is not available, which I think increases the standard for Mr. Galan-Najaro to provide something outside what is required by the regulation. Thank you, counsel. Thank you both counsel for your arguments and cases now submitted. And we'll move on to our final argument of the day in Lindsey Bollinger versus City of Oakland, case number 19-16550.
judges: Clifton, N.R. Smith, Nelson